IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

INFOMC, INC.,                              :
                                           :        CIVIL ACTION
              Plaintiff,                   :
                                           :        NO. 10-4907
       v.                                  :
                                           :
COMPREHENSIVE BEHAVIORAL                   :
CARE, INC., et al.,                        :
                                           :
              Defendants.                  :

## OPINION

**Slomsky, J.**                                        **March 30, 2012**

## I.      INTRODUCTION

Before the Court are Defendants' Motion to Dismiss Plaintiff's Complaint pursuant to

Federal Rule of Civil Procedure 12(b)(2) (Doc. No. 10), and Defendants' Alternative Motion to

Transfer Venue to the District Court of Puerto Rico pursuant to 28 U.S.C. § 1404(a) (Doc. No.

26).  Plaintiff InfoMC's claims arise out of a business relationship in which Plaintiff and

Defendants collaborated on a proposal to submit to "Reforma," the state Medicaid program in

Puerto Rico ("Reforma Proposal").  (Doc. No. 1 ¶ 14.)  According to the Complaint, Defendants

Comprehensive Behavioral Care, Inc. ("CBC") and CompCare de Puerto Rico, Inc. ("CCPR")

(collectively "Defendants") acquired "intellectual property"[1] from Plaintiff while working on the

_____

[1] Plaintiff avers that it provided to Defendants information and marketing materials that
reflected InfoMC's "proprietary know-how."  (Doc. No. 1 ¶ 15.)  For example, Plaintiff provided
marketing and promotional materials relating to its "eCura" software, web snapshots showing
how the software works, as well as written descriptions of how the software functions.  (Id.)
Whether the materials at issue contain confidential or proprietary information goes to the merits
of Plaintiff's claims and is not before the Court at this time.  For the purposes of this Opinion, the

Reforma proposal, and subsequently used that information in a second proposal made to another

company, without Plaintiff's knowledge or consent.  (Id. ¶¶ 14-25.)  Plaintiff further alleges that

Defendants used Plaintiff's trademarks and the goodwill associated with those marks in order to

secure a subsequent health care contract without the consent of Plaintiff.  (Id. ¶¶ 22, 25.)

On September 21, 2010, Plaintiff commenced the instant litigation, asserting seven

claims against Defendants: trademark infringement, false advertising, and unfair competition

under the Lanham Act (Counts I, II, and III) (Doc. No. 1 ¶¶ 27-45), unfair competition,

conversion, promissory estoppel, and unjust enrichment under Pennsylvania law (Counts IV, V,

VI, and VII) (id. ¶¶ 46-63).

On December 6, 2010, Defendants filed the instant Motion to Dismiss Plaintiff's

Complaint, arguing that this Court lacks personal jurisdiction over Defendants CBC and CCPR.

(Doc. No. 10.)  Plaintiff filed an Answer to Defendants' Motion to Dismiss, accompanied by an

Appendix of Exhibits in Opposition to Defendants' Motion to Dismiss (hereinafter "Pl. App.

Ex.").  (Doc. No. 15.)  On February 11, 2011, following oral argument on Defendants' Motion to

Dismiss, the Court granted Plaintiff's request to conduct jurisdictional discovery.[2]  (Doc. No. 21.)

---

Court refers to these materials as Plaintiff's "intellectual property," but will make no finding as
to the nature of their actual content.  Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 457 (3d
Cir. 2003) ("It is well established that in deciding a motion to dismiss for lack of jurisdiction, a
court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in
favor of the plaintiff.").

[2] According to the Third Circuit, "courts are to assist the plaintiff by allowing
jurisdictional discovery [in personal jurisdiction inquiries,] unless the plaintiff's claim is 'clearly
frivolous.'"  Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir. 2003) (citing Mass.
Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 107 F.3d 1026, 1042 (3d Cir. 2007)).  If a
plaintiff presents "factual allegations that suggest with reasonable particularity the possible
existence of the requisite contacts between the party and the forum state, the plaintiff's right to
conduct jurisdictional discovery should be sustained."  Toys "R" Us, Inc., 318 F.3d at 456

After completing three months of discovery, Plaintiff and Defendants submitted supplemental briefing on Defendants' Motion to Dismiss (Doc. Nos. 27, 28), as well as two separate appendices of exhibits (hereinafter "Def. App. Ex" and "Pl. Supp. App. Ex.").[3] Defendants also filed an Alternative Motion to Transfer Venue to the District Court of Puerto Rico, pursuant to 28 U.S.C. § 1404(a) (Doc. No. 26), to which Plaintiff filed a timely response (Doc. No. 28).

For reasons discussed below, the Court will deny Defendants' Motion to Dismiss, but will grant Defendants' Alternative Motion to Transfer Venue.[4]

---

(internal citations and alterations omitted).  At the hearing held on February 10, 2011, the Court granted Plaintiff's request to conduct jurisdictional discovery and entered a written Order allowing it to proceed.  (Doc. Nos. 20, 21.)

[3] Defendants' Appendix of Exhibits ("Def. App. Ex.") and Plaintiff's Supplemental Appendix of Exhibits ("Pl. Supp. App. Ex.") were both filed "under seal."  The Court has considered all exhibits in deciding the instant motions.  However, in order to maintain confidentiality of protected materials, the Court will discuss the relevant exhibits in general terms only.  (See Doc. No. 24.)

[4] In deciding Defendants' Motion to Dismiss and Alternative Motion to Transfer Venue, the Court has considered the following documents: Defendants' Motion to Dismiss Plaintiff's Complaint and Memorandum of Law in Support thereof (Doc. Nos. 10, 11), Plaintiff's Answer to Defendants' Motion to Dismiss and Appendix of Exhibits in Opposition to Defendants' Motion to Dismiss (Doc. No. 15; Pl. App. Ex.), Defendants' Reply Brief in Further Support of Motion to Dismiss Plaintiff's Complaint (Doc. No. 19), Defendants' Alternative Motion to Transfer Venue (Doc. No. 26), Defendants' Supplemental Memorandum of Law in Further Support of Defendants' Motion to Dismiss and Alternative Motion to Transfer Venue, (Doc. No. 27), Defendants' Appendix of Exhibits (Def. App. Ex.), Plaintiff's Answer to Defendants' Motion to Transfer Venue (Doc. No. 28), Plaintiff's Supplemental Appendix of Exhibits in Opposition to Defendants' Motion to Dismiss (Pl. Supp. App. Ex.), and Defendants' Reply Memorandum of Law in Further Support of Defendants' Alternative Motion to Transfer Venue (Doc. No. 29).

II.     **STATEMENT OF FACTS**

A.     <u>Plaintiff's Business</u>

Plaintiff, InfoMC, Inc., is a Pennsylvania corporation engaged in the business of developing proprietary software to assist in the management of behavioral health care services, including mental health care and related services.  (Doc. No. 1 ¶¶ 1-2; Doc. No. 15 at 2.)  Plaintiff's proprietary software trades under the mark "eCura."  (Doc. No. 1 ¶ 9.)  In addition to software development, Plaintiff oversees the implementation and management of the "eCura" software.  (<u>Id.</u> ¶ 1.)   Plaintiff maintains a single office located in Conshohocken, Pennsylvania. (<u>Id.</u> ¶ 2; Pl. App. Ex. A ¶ 2.)

Beginning as early as August 1, 1994, Plaintiff has continuously used the "InfoMC" mark in commerce.  (Doc. No. 1 ¶ 10.)  On September 8, 1998, the United States Patent & Trademark Office ("PTO") registered the InfoMC service mark on the Principal Register under Registration No. 2,187,275.  (<u>Id.</u> ¶ 11.)  In addition, the "eCura" mark has continuously been used by Plaintiff in commerce from November 20, 1999.  (<u>Id.</u> ¶ 10.)  On July 31, 2011, the "eCura" trademark was registered by the PTO under Registration No. 2,474,876.  (<u>Id.</u> ¶ 11.)  In sum, the "InfoMC" and "eCura" marks (collectively referred to as Plaintiff's "marks") have been used by Plaintiff in commerce since 1994 and 1999, respectively, and both marks are registered with the PTO.

Over the last fifteen years, Plaintiff estimates spending over $3 million on advertising and marketing to promote the marks.  (<u>Id.</u> ¶ 12.)  During that time, Plaintiff licensed "eCura" to more than sixty (60) behavioral health care payors throughout the United States.  (<u>Id.</u> ¶ 9; Pl. App. Ex. A ¶ 3.)  As of September 21, 2010, "eCura" is licensed to over thirty (30) health care payors,

including Aetna, Amerihealth Mercy, and United Behavioral Health.  (Doc. No. 1 ¶ 9; Pl. App.

Ex. A ¶ 3.)  As a result of these promotional efforts and financial expenditures, the "InfoMC"

and "eCura" marks have achieved fame and notoriety in the behavioral health care software

marketplace, and there is substantial goodwill associated with the marks.  (Doc. No. 1 ¶ 13.)

According to Plaintiff, Defendants used the "InfoMC" and "eCura" marks, and the goodwill

associated with them, without Plaintiff's knowledge or consent, in violation of the Lanham Act,

15 U.S.C. § 1114, *et seq*., and Pennsylvania common law.  (Id. ¶ 22.)

      B.    Defendants' Businesses

      Defendant CBC, a Nevada corporation with its principal place of business in Tampa,

Florida, is a wholly owned subsidiary of Comprehensive Care Corporation ("CompCare").[5]

(Doc. No. 10-1 ¶¶ 3, 5.)  CompCare is a publicly traded company that was established in 1969

and is headquartered in Tampa, Florida.  (Id. ¶ 3.)  Through its subsidiaries, CompCare provides

behavioral health, substance abuse and employee assistance programs for governmental agencies,

managed care companies, and employer groups throughout the United States and Puerto Rico.

(Id.)  Specifically, Defendant CBC and its subsidiaries, including Defendant CCPR, provide

managed care services in the behavioral health and psychiatric fields.  (Id. ¶ 4.)

      Defendant CCPR is a Puerto Rican corporation formed in September 2008, with its

principal place of business in Tampa, Florida.[6]  (Doc. No. 1 ¶ 4; Doc. No. 10-1 ¶ 7.)  From the

---

[5]  Comprehensive Care Corporation ("CompCare") is not a party to this action.

[6]  The Complaint lists CCPR's principal place of business as 3405 West Dr. Martin Luther King, Jr. Boulevard, Suite 101, Tampa, FL 33607.  (Doc. No. 1 ¶ 4.)  However, Defendants' documents state that Defendant CCPR's principal place of business is located in Puerto Rico.  (Doc. No. 10-1 ¶ 6; Doc. No. 11 at 4.)  This discrepancy is not addressed in the record.

time of its formation until late July 2010, Defendant CBC owned a majority interest in CCPR. (Doc. No. 10-1 ¶ 7.)  INSPIRA Mental Health Management, Inc., a Puerto Rican-based mental health management provider, owned a minority interest.  (Id.)  In late July 2010, Defendant CBC acquired INSPIRA's minority interest and thereafter assumed full ownership of Defendant CCPR.  (Id. ¶ 9.)

According to Defendants, neither CBC nor CCPR have any *actual* physical presence in Pennsylvania.  (Id. ¶ 10.)  Neither Defendant has offices or other facilities located in Pennsylvania, nor are any officers, directors or employees located within the forum.  (Id.) Defendants maintain that CCPR was formed with the specific purpose of conducting business in the Commonwealth of Puerto Rico.  (Doc. No. 10-1 ¶ 6; Doc. No. 11 at 5.)  As such, CCPR has no contracts to provide services to any entity outside of Puerto Rico.  (Doc. No. 10-1 ¶ 8.)

In contrast, Defendant CBC has contracts to provide behavioral health services in nine states, as well as Puerto Rico, and has over 21,000 providers located in approximately thirty-nine (39) states.  (Doc. No. 10-1 ¶ 5.)  Furthermore, CBC has been registered to do business in Pennsylvania since July 31, 1995.  (Doc. No. 15 at 22; Pl. App. Ex. W.)  In December 2009, CBC entered into a contract with a Pennsylvania organization named Health Partners, the largest independent Medicaid plan in the Philadelphia area.  (Doc. No. 11 at 5; Doc. No. 15 at 22; Pl. App. Ex. W.)  Under this contract, CBC provides behavioral health services for Health Partners' members enrolled in the KidzPartners program, which provides free or low-cost health insurance to uninsured children and teenagers in accordance with Pennsylvania's Children's Health Insurance Program.  (Doc. No. 11 at 5-6; Pl. App. Ex. W.)

In order to service the Health Partners contract, CBC has contracted with approximately 150 Pennsylvania health care service providers.  (Doc. No. 10-1 ¶ 13; Doc. No. 15 at 22.) According to the Affidavit of Clark A. Marcus, Chairman of the Board of Directors and Chief Executive Officer of Defendant CBC, other than the Health Partners contract and associated provider agreements, CBC has no other contract to provide its services to any Pennsylvania residents.  (Doc. No. 10-1 ¶¶ 12, 17.)

C.      Reforma Proposal

Plaintiff's claims arise out of its collaboration with Defendants on the Reforma Proposal, during which Plaintiff provided to Defendants intellectual property in regard to eCura. According to the Complaint, Defendants later used that intellectual property in a proposal made to two behavioral health companies, MMM Healthcare Inc. and PMC Medicare Choice, Inc. ("MMM-PMC Proposal"), without Plaintiff's knowledge or consent.  (Doc. No. 1.)

In the spring of 2009, Richard Powers, CBC Senior Vice President for Business Development, called Quadir Farook, Plaintiff's CEO located in Pennsylvania and invited Plaintiff to partner with Defendants on the Reforma proposal.[7]  (Doc. No. 15 at 5; Pl. App. Ex. A ¶ 4.)  Powers' initial telephone call, and many thereafter, were placed to Farook's cell phone while he was located in Pennsylvania.  (Pl. App. Ex. A ¶ 4; Def. App. Ex. 2.)  According to Farook, Plaintiff would provide its services from Pennsylvania, including project management,

---

[7]  In late February 2009, Powers and Stacey Yawn, a CBC Marketing Writer/Editor, emailed Farook requesting preliminary assistance with the Reforma proposal.  (Pl. Supp. App. Exs. 10, 11.)  The record does not reflect the exact date on which Powers' called Farook to formally invite InfoMC to collaborate on the Reforma Proposal.

configuration, WebEx training, remote installation, consulting, support and maintaining a Help Desk.  (Pl. Supp. App. Ex. 4 ¶ 1.)

On June 11, 2009, Lisa Smithers-Cambridge, CBC's Vice President for Claims, traveled to Pennsylvania for a two-day visit to inspect and become familiar with Plaintiff's eCura technology.[8]  (Doc. No. 15 at 3; Pl. App. Ex. B ¶ 3.)  Jennifer Hill-Jones,[9] InfoMC's Product Manager, coordinated the visit and accompanied Smithers-Cambridge on both days.  (Pl. App. Exs. B, C.)  This was the only visit by CBC or CCPR personnel in connection with the Reforma proposal.  (Doc. No. 27 at 7.)

Following Smithers-Cambridge's visit, Richard Powers sent an email to Farook and Hill-Jones containing sections of the Reforma proposal, so that InfoMC could begin preparing responses.  (Doc. No. 15 at 6.)  During July and August 2009, employees of the three companies exchanged upwards of forty (40) emails on the Reforma Proposal.  (Pl. App. Exs. D, E, G, H-J; Pl. Supp. App. Exs. 24, 25.)  Plaintiff avers that included in these exchanges were proprietary screen shots of the eCura software, and descriptions of the software that featured the "eCura" and "InfoMC" marks, to be used in the presentation for the Reforma Proposal.  (Doc. No. 15 at 7; Pl. App. Exs. G, I.)  On July 29, 2009, CBC's Stacey Yawn emailed InfoMC's Hill-Jones a to-do list and an issues memo that delegated several assignments to be performed by Plaintiff.  (Doc. No. 15 at 6; Pl. App. Ex. E.)

_____

[8]  According to Defendants, this visit was "solely for the purposes of due diligence, to evaluate the InfoMC system."  (Doc. No. 27 at 7.)

[9]  At some point in 2009, Ms. Hill was married and now prefers to be called by her married named, Jennifer Hill-Jones.  (Def. App. Ex. 2 at 3, 28-29.)  She will be referred to in this Opinion by her married name.

In addition to emails, Plaintiff was invited by Defendants' employees to participate in a number of conference calls relating to the Reforma Proposal.  (Doc. No. 15 at 6-7; Pl. App. Ex. B ¶¶ 7-10.)  Plaintiff was also contacted through email and telephone calls by Defendant CCPR's computer consultant, Jason deSouza, requesting a demonstration on the configuration of the eCura software and how to access the proprietary materials.  (Doc. No. 15 at 7; Pl. App. Ex. B ¶¶ 11-12; Pl. App. Exs. I, J.)

In sum, Defendants produced approximately 1,580 pages of emails exchanged between CBC/CCPR personnel and InfoMC personnel relating to the Reforma and MMM-PMC Proposals,[10] of which approximately 1,330 pages (or 84%) relate to the Reforma Proposal. (Doc. No. 27 at 6 n.5.)  Moreover, Plaintiff estimates that it participated in six to ten conference calls with employees of Defendants relating to the Reforma Proposal.  (Doc. No. 15 at 6.)  On October 8, 2009, the Reforma project was put on hold.  (Doc. No. 27 at 8.)  At that time, there existed a number of outstanding issues regarding the terms of a future contract between the parties.  (Id.)  According to Defendants, on that same day, Plaintiff's Farook requested a meeting with John Hill, then-President and CEO of CCPR, for the purpose of reviewing future arrangements between the companies.  (Id. at 8-9; Def. App. Exs. 21, 23.)

D.    MMM-PMC Proposal

On or about November 16, 2009, Defendant CCPR submitted a proposal to MMM Healthcare, Inc. and PMC Medicare Choice, Inc. ("MMM-PMC Proposal"), both behavioral health care plans in Puerto Rico.  (Doc. No. 1 ¶ 16.)  Plaintiff maintains that the MMM-PMC

---

[10]   The MMM-PMC Proposal is the one Plaintiff contends was submitted without its authorization and is discussed *infra*, Section II.D.

Proposal was submitted without Plaintiff's knowledge or consent.  According to the Complaint,

the MMM-PMC Proposal included verbatim sections of the Reforma Proposal that were written

by Plaintiff's staff.  (Id. ¶ 19; Doc. No. 15 at 8; Pl. App. Ex. B ¶ 16; Pl. App. Ex. K.)  The

MMM-PMC Proposal also included intellectual property provided by Plaintiff during work on

the Reforma Proposal, including web screen shots and descriptions of eCura's functions.

(Doc. No. 1 ¶¶ 20-21.)  Plaintiff further maintains that Defendants portrayed eCura as their own

software solution by displaying the InfoMC and eCura marks throughout the MMM-PMC

Proposal, specifically referring to eCura by name at least seventeen times, and by making explicit

reference to Plaintiff's well-established customers during the MMM-PMC presentation.  (Id.

¶ 22; Pl. App. Ex. K.)

        According to Plaintiff, it was not made aware of the MMM-PMC Proposal until January

24, 2010, more than two months after its initial submission by Defendants to the health care

plans.  (Doc. No. 15 at 6.)  Plaintiff learned about this turn of events when InfoMC's Farook

received a telephone call from Remedios "Reme" Rodriguez, CBC's Vice President for

Corporate Development, during which Rodriguez asked for InfoMC to partner with Defendants

as the behavioral health care software provider on the MMM-PMC Proposal.  (Id.; Pl. App.

Ex. A ¶ 10.)  The following day, Rodriguez emailed Farook requesting access to InfoMC's

system so that she could demonstrate Plaintiff's software during the presentation to MMM-PMC.

(Doc. No. 15 at 6; Pl. App. Ex. A ¶ 11; Pl. App. Ex. L.)

        During the ensuing months, Rodriguez was in contact with Farook and Jennifer Hill-

Jones by email and telephone, requesting their assistance in making various presentations of the

MMM-PMC Proposal.  (Doc. No. 15 at 8-9; Pl. App. Exs. L, M, N.)  Also during this time,

Rodriguez called Farook and asked him to provide a commitment letter to CBC's John Hill, confirming that InfoMC was CCPR's partner on the MMM-PMC project.  (Doc. No. 15 at 9; Pl. App. Ex. A ¶ 15; Pl. App. Ex. O.)  Accordingly, Farook prepared and issued a commitment letter to Rodriguez on May 15, 2010.  (Pl. App. Ex. A ¶¶ 14-16; Pl. App. Ex. P.)

Between June 21 and June 25, 2010, CBC's Rodriguez and InfoMC's Farook exchanged a number of emails and telephone calls concerning Plaintiff's financial proposal for the PMC-MMM project.  (Doc. No. 15 at 9-10.)  In an email dated June 21, 2010, Rodriguez described the system requirements and requested a financial proposal.  (Pl. App. Ex. Q.)  Specifically, Rodriguez wrote: "If we can get a proposal tomrrow [sic] evening that will be great.  The plan asked us to reduce our price to agree on final pricing.  So we really need for you to give us a competative [sic] price."  (Id.)  On June 25, 2010, Farook emailed Rodriguez a draft of the financial proposal.  (Pl. App. Ex. R.)

Thereafter, on July 9, 2010, Rodriguez emailed Farook requesting a revised financial proposal, to which Farook responded immediately.  (Doc. No. 15 at 10.)  A few days later, CBC's Chief Executive Officer, Clark Marcus, spoke with Vince Rogusky, InfoMC's President, explaining that Plaintiff needed to lower its price for the MMM-PMC project.  (Doc. No. 15 at 10; Pl. App. Ex. T ¶ 3.)  In response to this request, Rogusky emailed a revised proposal to CBC.  (Pl. App. Ex. U.)  During a subsequent telephone conversation, CBC's Chief Accounting Officer, Robert Landis, informed Rogusky for the first time that Defendants were considering other software providers for the MMM-PMC project.  (Doc. No. 15 at 10; Pl. App. Ex. T ¶ 5.)

In sum, Plaintiff estimates that Farook and other personnel of InfoMC had at least a dozen telephone calls with CBC or CCPR personnel relating to the MMM-PMC Proposal.

(Doc. No. 15 at 9-10; Pl. App. Ex. A ¶ 22.)  Moreover, of the 1,580 pages of emails produced by

Defendants, at least 200 (or 16%) relate to the MMM-PMC Proposal.  (Doc. No. 27 at 6 n.5.)

Ultimately, Defendants obtained the MMM-PMC contract, but used a different software

provider.  (Doc. No. 15 at 10.)  Plaintiff then commenced the instant action.  (Doc. No. 1.)

## III.   LEGAL STANDARD ON 12(b)(2) MOTION TO DISMISS

When a defendant challenges an action for lack of personal jurisdiction, the burden is on

the plaintiff to establish the personal jurisdiction of the court over the moving defendants.  Miller

Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004); Eagle Traffic Control, Inc. v. James

Julian, Inc., 933 F. Supp. 1251, 1255 (E.D. Pa. 1996).  A plaintiff need only present a prima facie

case of personal jurisdiction by "establishing with reasonable particularity sufficient contacts

between the defendant and the forum state."  Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,

960 F.2d 1217, 1223 (3d Cir. 1992) (internal citations omitted).  For the purposes of the 12(b)(2)

analysis, a plaintiff is entitled to have its allegations taken as true and all factual disputes drawn

in its favor.  Miller Yacht Sales, Inc., 384 F.3d at 97.  However, a plaintiff cannot rely on the

bare pleadings; they must respond with "actual proofs, not mere allegations."  Wilson v. RIU

Hotels & Resorts, No. 10-7144, 2011 WL 3241386, at *2 (E.D. Pa. July 29, 2011) (citing Time

Share Vacation Club v. Atl. Resorts, Ltd., 735 F.2d 61, 68 n.9 (3d Cir. 1984)).

If a plaintiff meets this standard, the burden shifts to the moving defendant to make a

"compelling case that the exercise of jurisdiction would be unreasonable."  Michael Williams

Consulting, LLC v. Wyckoff Heights Med. Ctr., No. 09-4328, 2010 WL 2674425, at *2 (D.N.J.

June 30, 2010) (citing Mellon Bank, 960 F.2d at 1226).

## IV.    DISCUSSION OF PERSONAL JURISDICTION

Under Federal Rule of Civil Procedure Rule 4(k)(1)(A), a district court may exercise personal jurisdiction over a non-resident defendant according to the extent permitted by the law of the state in which the federal court sits.  O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 316 (3d Cir. 2007); see also Guzzi v. Morano, No. 10-1112, 2011 WL 4631927, at *2 (E.D. Pa. Oct. 6, 2011).  Therefore, the Court must first examine Pennsylvania's long-arm statute to determine whether personal jurisdiction over the defendants is proper.  Pennsylvania's long-arm statute authorizes personal jurisdiction over non-residents "to the fullest extent allowed under the Constitution of the United States . . . ."  42 Pa. Cons. Stat. Ann. § 5322(b); see also O'Connor, 496 F.3d at 316.  Accordingly, the Court must examine whether the exercise of personal jurisdiction conforms with the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which requires that a non-resident defendant have "certain minimum contacts with . . . [Pennsylvania] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  O'Connor, 496 F.3d at 316-17 (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

In determining whether sufficient "minimum contacts" exist, the court must look at "the relationship among the defendant, the forum, and the litigation."  Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002); see Michael Williams Consulting, LLC, 2010 WL 2674425, at * 2.  Physical presence within the forum is not required to establish personal jurisdiction over non-resident defendants.  See Guzzi, 2011 WL 4631927, at *2 (citing IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998)).  Instead, personal jurisdiction may be based on either a

defendant's general contacts or specific contacts with the forum.  Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001).

General jurisdiction exists when "a defendant has maintained systematic and continuous contacts with the forum state."  Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007).  "To obtain general jurisdiction over a corporation in Pennsylvania, the corporation must either: (1) be incorporated in Pennsylvania or licensed as a foreign corporation in the Commonwealth, (2) consent to jurisdiction, or (3) carry on a continuous and systematic part of its general business within the Commonwealth."  Pac. Emp'rs. Ins. Co. v. AXA Belgium S.A., 785 F. Supp. 2d 457, 465 (E.D. Pa. 2011) (internal citations omitted); see also 42 Pa. Cons. Stat. Ann. § 5301(a)(2).[11] Notably, the defendant's contacts need not be related to the claim or claims being litigated. Guzzi, 2011 WL 4631927, at *3; see also Wilmington Fin., Inc. v. Moonis, No. 08-2365, 2008 WL 4661033, at *3 (E.D. Pa. Oct. 21, 2008) ("If the foreign party maintains 'continuous and

---

[11]   42 Pa. Cons. Stat. Ann. § 5301 provides in relevant part:

> (a) General rule.–The existence of any of the following relationships between a person and the Commonwealth shall constitute a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth to exercise general personal jurisdiction over such person . . .:
>
> *      *      *
>
> (2) Corporations. –
>> (i) Incorporation under or qualification as a foreign corporation under the laws of this Commonwealth.
>>
>> (ii) Consent, to the extent authorized by the consent.
>>
>> (iii) The carrying on of a continuous and systematic part of its general business within this Commonwealth.

systematic' contacts with a state, the state has general personal jurisdiction over the party, and the non-resident may be sued in that state on any claim.").

Alternatively, specific jurisdiction exists when "a claim arises from or relates to conduct purposely directed at the forum state." Henning v. Suarez Corp. Indus., Inc., 713 F. Supp. 2d 459, 464 (E.D. Pa. 2010) (citing Manning v. Flannery, No. 09-3190, 2010 WL 55295, at *5 (E.D. Pa. Jan. 6, 2010)). The Third Circuit has set forth a three-part inquiry to determine if specific jurisdiction exists.

> First, the defendant must have purposefully directed its activities at the forum. Second, the litigation must arise out of or relate to at least one of those activities. And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice.

O'Connor, 496 F.3d at 317 (internal citations and alterations omitted).

Ultimately, the exercise of personal jurisdiction, whether general or specific, must comport with "traditional notions of fair play and substantial justice" such that the parties can "reasonably anticipate being haled into court [here]." Integral Nuclear Assocs., LLC v. Nair, No. 05-382, 2005 WL 2012036, at *4 (E.D. Pa. Aug. 19, 2005); see also Michael Williams Consulting, LLC, 2010 WL 2674425, at *3 ("Regardless of whether a court exercises specific or general jurisdiction, it must be established that the defendant has purposefully directed its activities toward the residents of the forum state, . . . or otherwise 'purposefully avail[ed] itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws.'") (citing IMO Indus., Inc., 155 F.3d at 259).

Plaintiff maintains that this Court can exercise personal jurisdiction over Defendant CBC on the basis of both general and specific jurisdiction.  Moreover, Plaintiff contends that personal jurisdiction over Defendant CCPR is proper based on specific jurisdiction.  (Doc. No. 15 at 11.) Defendant CCPR argues that this Court cannot exercise personal jurisdiction over CCPR because it has neither general nor specific contacts with Pennsylvania.  (Doc. No. 11 at 16-18.)  While Defendant CBC concedes that general jurisdiction over it exists, it claims that the exercise of general jurisdiction in the instant matter would not comport with "fair play and substantial justice."  (Doc. No. 27 at 3 n.1.)

A.    Jurisdiction In Regard To Defendant CCPR

Defendants argue that Plaintiff has not met its burden of establishing sufficient minimum contacts for this Court to exercise general or specific jurisdiction over CCPR.  (Doc. Nos. 11, 19, 27.)  Plaintiff does not contend that CCPR is subject to general jurisdiction in this Court, but maintains that specific jurisdiction is proper based on the email and telephone communications between the parties.  (Doc. No. 15 at 11.)

First, CCPR asserts that telephone calls, emails, and a single visit by CBC personnel do not amount to "purposeful availment" of the privileges of conducting business in Pennsylvania. (Doc. No. 19 at 12-15.)  Defendants submit that the Court lacks specific jurisdiction under either the traditional three-part inquiry or the slightly refined *Calder* "effects test" that is applied to intentional torts,[12] because any tortious conduct was performed outside of Pennsylvania, by a

---

[12]  The *Calder* "effects test" requires a plaintiff to show the following:

(1) The defendant committed an intentional tort;
(2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the

Puerto Rican company that was planning to provide services to Puerto Rican residents.  (Id. at

16.)  Moreover, CCPR maintains that any contacts with Plaintiff were actually the result of

Plaintiff's ten-year pursuit of a business relationship with the CompCare family of companies.

(Id. at 7.)  Lastly, CCPR appears to consider its contacts with Plaintiff relating to the Reforma

Proposal as separate and distinct from its later contacts concerning the MMM-PMC proposal.

(Id. at 5 n.2.)

     As an initial matter, accepting Plaintiff's allegations as true, the Reforma and MMM-

PMC Proposals are intertwined and CCPR's contacts relating to the two proposals will not be

considered separately.  Any contact between CCPR and Plaintiff involving Plaintiff's intellectual

property is relevant to whether this Court has personal jurisdiction over Defendants.

     Next, the threshold issue for the Court to decide is whether Defendant CCPR

"purposefully avail[ed] itself of the privilege of conducting activities within [this] forum."

O'Connor, 496 F.3d at 317 (citing Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  The Third

Circuit has stated that "[m]ail and telephone communications sent by [a] defendant into the

forum may count toward the minimum contacts that support jurisdiction."  Grand Entm't Grp.,

---

         plaintiff as a result of that tort;
         (3) The defendant expressly aimed his tortious conduct at the forum
         such that the forum can be said to be the focal point of the tortious
         activity.

Marten v. Godwin, 499 F.3d 290, 297 (3d Cir. 2007) (citing IMO Indus., Inc. v. Kiekert AG, 155
F.3d 254, 165-66 (3d Cir. 1998)).  Because the Court holds that there is specific jurisdiction over
CCPR, it is not necessary to discuss further the *Calder* "effects test."

Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 482 (3d Cir. 1993).  However, such contacts must evidence a "deliberate targeting" of the forum.  O'Connor, 496 F.3d at 317.

While a few email and telephone communications by themselves are generally not enough to establish personal jurisdiction, Plaintiff's exhibits show that the majority of business conducted between the parties was through such wire communications.  Moreover, as a result of jurisdictional discovery, Defendants have produced approximately 1,580 pages of emails exchanged between the parties and their personnel.  (Doc. No. 27 at 6 n.5.)  Plaintiff also has produced evidence of the participation of its employees, at Defendants' request, in multiple conference calls with Defendants' personnel.  (Pl. App. Ex. B ¶¶ 7-10, 14; Pl. App. Exs. F, M, N; Pl. Supp. App. Ex. 5 at 39.)

These contacts clearly relate to the subject matter of this litigation, the Reforma and MMM-PMC Proposals, and Plaintiff's claims directly arise out of these contacts.  See Cozen O'Connor, P.C. v. Fischbein, 09-4931, 2010 WL 1053220, at *4 (E.D. Pa. Mar. 16, 2010) (finding sufficient minimum contacts based on at least five letters and one telephone call that were directly related to the loans at issue in the case); see also Grand Entm't Grp., Ltd, 988 F.2d at 483 ("Where the contacts evaluated are those that give rise to the litigation, even one contact with the forum may be enough to justify jurisdiction as long as the other criteria are met.").  Moreover, the sheer volume of the exhibits produced by all parties reveals that their relationship involved more than a "few calls and emails," as alleged by Defendants.  (Doc. No. 11 at 17.)  Construing the facts in the light most favorable to Plaintiff, the Court concludes that these minimum contacts demonstrate that CCPR has purposefully availed itself of the benefits of doing business in Pennsylvania and that this Court has personal jurisdiction over CCPR.

-18-

Finally, the Court must consider whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476-77 (1985). Because it has minimum contacts with the Commonwealth under the first two steps of the specific jurisdiction analysis, CCPR must make a "compelling case" that litigation in Pennsylvania would be unreasonable and unfair. O'Connor, 496 F.3d at 324-25. CCPR has not met this burden. As the Third Circuit stated in O'Connor, "when minimum contacts exist, due process demands no more than a reasonable forum." 496 F.3d at 325. While Pennsylvania may not be the "best" or most convenient forum for the instant litigation,[13] it appears that jurisdiction in this district would be fair and reasonable.

B.     Jurisdiction In Regard To Defendant CBC

Defendants concede that general personal jurisdiction exists over CBC because it is registered to do business in Pennsylvania. (Doc. No. 27 at 3 n.1); see 42 Pa. Cons. Stat. Ann. § 5301. Nonetheless, Defendants argue that the exercise of general jurisdiction would not comport with "fair play and substantial justice." (Doc. No. 27 at 3 n.1.) CBC maintains that it had "absolutely no connection to this dispute other than by acting as an agent of CCPR" in trying to facilitate deals on the Reforma and MMM-PMC proposals. (Id. at 19.) Furthermore, many of Defendants' personnel who worked with Plaintiff held dual roles and titles. (Id. at 5.) As such, Defendants contend that at all times these employees were acting on CCPR's behalf when contacting Plaintiff about the Reforma and MMM-PMC proposals. (Id. at 20-21.)

---

[13] As discussed in Section VI *infra*, the Court will grant Defendants' Alternative Motion to Transfer Venue based on an analysis of the relevant factors.

On the other hand, Plaintiff argues that the Court not only has general jurisdiction over CBC, but that it can also exercise specific jurisdiction over CBC because it was the "moving force" behind the two proposals submitted by CCPR.  (Doc. No. 15 at 16-19.)  Plaintiff relies on American Eagle Outfitters, Inc. v. Lyle & Scott Ltd., No. 06-607, 2007 WL 1202760 (W.D. Pa. Apr. 12, 2007), where the court held that when a parent directs the activities of the subsidiary with respect to the transaction in question, both should be subject to jurisdiction in the federal forum.[14]  Because the Court can properly exercise general jurisdiction over Defendant CBC, it is unnecessary to engage in this analysis.

As CBC concedes, Pennsylvania law explicitly states that the court can exercise jurisdiction over a corporation that is "qualif[ied] as a foreign corporation under the laws of this Commonwealth."  42 Pa. Cons. Stat. Ann. § 5301(a).  Because Defendant CBC has been registered to do business in Pennsylvania since July 31, 1995, it is subject to general jurisdiction. See Eagle Traffic Control, Inc. v. James Julian, Inc., 933 F. Supp. 1251, 1256 (E.D. Pa. 1996) ("The bottom line is that Pennsylvania's long-arm statute provides for personal jurisdiction when a foreign corporation takes the particular action of becoming authorized to do business in Pennsylvania.  The statute complies with due process because becoming authorized is an affirmative act 'by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'") (citing

---

[14]  In American Eagle Outfitters, Inc., the court discussed the opinion of the Third Circuit in Publicker Indus., Inc. v. Roman Ceramics Corp., 652 F.2d 340 (3d Cir. 1981), in which the Third Circuit recognized that "where a corporate parent has substantial involvement in the negotiation, formation, and/or renegotiation of a subsidiary's contract, the aggrieved party is not limited to the relatively onerous standards applicable under the 'traditional alter ego theory for piercing the corporate veil.'"  Am. Eagle Outfitters, Inc., 2007 WL 1202760 at *3 (citing Publicker Indus., Inc., 652 F.2d at 342) (alterations omitted).

Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  Thus, Defendant CBC was on notice that it may "reasonably anticipate being haled into court" in Pennsylvania.  See Eagle Traffic Control, Inc., 933 F. Supp. at 1255 (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

Defendants argue that the Court should decline to exercise jurisdiction over CBC because it had "absolutely no connection to this dispute other than by acting as an agent of CCPR." (Doc. No. 27 at 19.)  For this reason, they claim that "fair play and substantial justice" require this Court to grant their Motion to Dismiss.  Their arguments are not persuasive for the following reasons.

Plaintiff's allegations and exhibits, viewed in the light most favorable to Plaintiff, demonstrate that CBC had business contacts in Pennsylvania and that its employees did not distinguish on whose behalf they were working when contacting Plaintiff about the Reforma and PMC-MMM proposals.  Moreover, some personnel who communicated with Plaintiff's employees are employed only by Defendant CBC.  Second, while some employees held titles in both companies, those employees used their CBC titles during the majority of their communications with Plaintiff.

For example, Richard Powers, Vice President of CBC, originally contacted Quadir Farook in 2009 to formally invite InfoMC to work on the Reforma proposal, and thereafter communicated with InfoMC by telephone and email.  (Doc. No. 28 at 3; Pl. App. Exs. D, G.) Powers has never been employed by CCPR, and during his deposition he stated that he contacted Plaintiff's Farook in his capacity as Vice President of CBC and under a management contract with CCPR.  (Pl. Supp. App. Ex. 7 at 8, 28-30.)

Jurisdictional discovery also revealed that Lisa Smithers-Cambridge was employed by CBC only.  (Pl. Supp. App. Ex. 20 at 4.)  Stacey Yawn and Michelle Brochu, who both contacted Plaintiff's employee Jennifer Hill-Jones by telephone and email, were also employed by CBC. (Id. at 3.)  Moreover, Yawn was the employee who prepared the PMC-MMM Proposal under the supervision of Richard Powers.  (Pl. Supp. App. Ex. 7 at 45.)  Finally, CBC's Chief Information Officer contacted Plaintiff's Farook on June 23, 2010 regarding two remaining technical questions for the PMC-MMM Proposal.  (Pl. Supp. App. Ex. 18.)

Remedios "Reme" Rodriguez held roles in both Defendant companies since she began working for CBC in 2007 or 2008, and is currently the President of CCPR.  (Pl. Supp. App. Ex. 8 at 8-13.)  Before CCPR became a wholly-owned subsidiary of Defendant CBC, Rodriguez held the title of "Vice President of Development of Comprehensive Behavioral Care" (CBC). (Id. at 9.)  Following the acquisition, Rodriguez was promoted to act as CCPR's President in Puerto Rico.  (Pl. Supp. App. Ex. V.)  During her deposition, Rodriguez stated that she had held titles with CCPR prior to her promotion.  (Pl. Supp. App. Ex. 8 at 12-13.)  However, the email correspondence submitted by Plaintiff show that Rodriguez' signature block often used a signature block noting her role as Vice President of Development with CBC.  (Pl. App. Exs. L-O, Q.)  Although an email dated September 28, 2009 suggests that Rodriguez held some role within CCPR prior to her promotion in July 2010 (Pl. Supp. App. Ex. 17), the overwhelming majority of email correspondence between Rodriguez and Plaintiff's employees contain the signature block showing Rodriguez' title with CBC (Pl. App. Exs. L-O, Q).

The record contains many examples of communications from Defendants' employees that do not distinguish on whose behalf those employees were acting, and as discussed above, a

number of those employees were not employed by Defendant CCPR.  The record also does not

support CBC's claim that it had no connection to this dispute other than by acting as an agent of

CCPR.[15]  Moreover, because CBC has been registered to do business in Pennsylvania since 1995,

has a contract with a Pennsylvania organization, Health Partners, and contracts with at least 150

providers in the state in order to serve the Health Partners contract, it does not offend traditional

notions of "fair play and substantial justice" for the Court to exercise general jurisdiction over

Defendant CBC.

## V.    LEGAL STANDARD ON MOTION TO TRANSFER VENUE

A district court may transfer a case pursuant to § 1404(a) "for the convenience of parties

and witnesses, in the interest of justice" to "any other district or division where it might have

been brought." 28 U.S.C. § 1404(a).  In Jumara v. State Farm Ins. Co., 55 F.3d 873 (3d Cir.

1995), the Third Circuit set forth additional "private interest" and "public interest" factors that a

district court may consider in deciding a motion to transfer.  55 F.3d at 879-80.  The court may

consider "private interests" including:

> (a) plaintiff's forum preference as manifested in the original choice,
> (b) the defendant's preference, (c) whether the claim arose elsewhere,
> (d) the convenience of the parties as indicated by their relative
> physical and financial condition, (e) the convenience of the witnesses-
> but only to the extent that the witnesses may actually be unavailable
> for trial in one of the fora, and (f) the location of books and records
> (similarly limited to the extent that the files could not be produced in
> the alternative forum).

Id. at 879 (internal citations omitted).  The "public interests" for the court to consider are:

---

[15]    The Court makes no finding as to the merits of Plaintiff's claims against either
Defendant, or the liability of Defendant CBC for the alleged conduct of Defendant CCPR.  For
purposes of the personal jurisdiction analysis, the Court finds only that Defendant CBC is
sufficiently connected to this matter to remain a party at this stage of the proceedings and subject
to the jurisdiction of this Court.

> (a) the enforceability of the judgment, (b) practical considerations that could make the trial easy, expeditious or inexpensive, (c) the relative administrative difficulty in the two fora resulting from court congestion, (d) the local interest in deciding local controversies at home, (e) the public policies of the fora, and (f) the familiarity of the trial judge with the applicable state law in diversity cases.

Id. at 879-80 (internal citations omitted).

The moving party bears the burden of establishing that: (1) venue is proper in the transferee forum, (2) transfer is more convenient for the parties and witnesses, and (3) transfer would be in the interest of justice. Lehr v. Stryker Corp., No. 09-2989, 2010 WL 3069633, at *3 (E.D. Pa. Aug. 4, 2010). While there is ordinarily a strong presumption in favor of a plaintiff's choice of forum, a court is vested with "broad discretion to determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." Jumara, 55 F.3d at 883; see also Hollander v. Hospira, Inc., No. 10-235, 2010 WL 4751669, at *3 (E.D. Pa. Nov. 22, 2010). Therefore, the burden is on the moving party to show that "all relevant things considered, the case would be better off transferred to another district." In re United States, 273 F.3d 380, 388 (3d Cir. 2001) (internal quotations omitted); see also Inaganti v. Columbia Props. Harrisburg, LLC, No. 10-1651, 2010 WL 2471671, at *2 (E.D. Pa. June 15, 2010) (recognizing that § 1404(a) transfer analysis is flexible and must be made on the unique facts of each case).

**VI.   DISCUSSION OF TRANSFER OF VENUE**

    A.   <u>Venue</u>

Section 1404(a), as noted above, provides for the transfer of a case where both the

original and the potential transferee venue are proper pursuant to 28 U.S.C. § 1391.  Section

1391 provides in pertinent part:

> (b) A civil action wherein jurisdiction is not founded solely on
> diversity of citizenship may, except as otherwise provided by law, be
> brought only in (1) a judicial district where any defendant resides, if
> all defendants reside in the same State, (2) a judicial district in which
> a substantial part of the events or omissions giving rise to the claim
> occurred, or a substantial part of property that is the subject of the
> action is situated, or (3) a judicial district in which any defendant may
> be found, if there is no district in which the action may otherwise be
> brought.
>
> (c) For purposes of venue under this chapter, a defendant that is a
> corporation shall be deemed to reside in any judicial district in which
> it is subject to personal jurisdiction at the time the action is
> commenced.  In a State which has more than one judicial district and
> in which a defendant that is a corporation is subject to personal
> jurisdiction at the time an action is commenced, such corporation
> shall be deemed to reside in any district in that State within which its
> contacts would be sufficient to subject it to personal jurisdiction if
> that district were a separate State, and, if there is no such district, the
> corporation shall be deemed to reside in the district within which it
> has the most significant contacts.

28 U.S.C. § 1391.

Since this case does not arise under diversity of citizenship jurisdiction, and a substantial

number of events giving rise to Plaintiff's claims occurred in Puerto Rico,[16] venue would be

proper in the District of Puerto Rico under § 1391(b)(2).  Moreover, both CBC and CCPR are

residents of Puerto Rico pursuant to § 1391(c), as CCPR is a Puerto Rican corporation and

---

[16] See *infra* Section IV.B.iii.

Defendants' concede that Puerto Rico would have jurisdiction over CBC because of its on-going relationships with several Puerto Rican entities.  (Doc. No. 10-1 ¶ 7; Doc. No. 27 at 22 n.14.) For this additional reason, venue would be proper in the District of Puerto Rico under § 1391(b)(1) and (c).  A court may transfer a case pursuant to § 1404(a) if both the original venue and transferee venue are proper.  For the reasons discussed above in Section IV *supra*, venue is proper in the Eastern District of Pennsylvania because Defendants are subject to personal jurisdiction in this district.  See 28 U.S.C. § 1391(b)(1), (c).  Moreover, as noted, venue is proper in the District of Puerto Rico because a substantial part of the events giving rise to Plaintiff's claims occurred in that district and both CBC and CCPR "reside" in that district. Accordingly, venue is proper in both districts.

Since venue would be proper in the District of Puerto Rico, the Court must determine whether transfer of this case to that District would be more convenient for the parties and witnesses, and whether transfer would be in the "interest of justice" after balancing private and public interest factors which are referred to as the *Jumara* factors.  See Jumara v. State Farm Ins. Co., 55 F.3d 873, 879-80 (3d Cir. 1995).

B.       Private Interests

i.       *Plaintiff's Forum Preference*

Generally, a strong presumption exists in favor of a plaintiff's chosen forum, and when a plaintiff files suit in his home forum, "that choice is entitled to considerable deference."  Bond v. Laser Spine Inst., LLC, No. 10-1086, 2010 WL 3212480, at *11 (E.D. Pa. Aug. 11, 2010) (citing Inaganti, 2010 WL 2471671, at *2); see also Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981).  However, when the cause of action did not occur in, or few of the operative facts took

place in the selected forum, plaintiff's choice is afforded less weight.  Hollander, 2010 WL

4751669, at *4 (granting less deference to plaintiff's forum choice where few of the operative

facts took place in Pennsylvania); Paul Green Sch. of Rock Music Franchising, LLC v. Rock

Nation, LLC, No. 08-4503, 2009 WL 129740, at *3 (E.D. Pa. Jan. 13, 2009) (plaintiff's choice of

forum given less weight when almost all relevant acts took place in California).

Here, Plaintiff is a Pennsylvania corporation and has filed suit in its home forum.

(Doc. No. 1.)  Plaintiff contends that the operative facts giving rise to its claims occurred in this

district because: 1) the alleged misrepresentations were made during telephone calls that

Defendants' employees made to Pennsylvania, 2) Plaintiff would be providing the majority of its

services from Pennsylvania, and 3) Defendants emailed InfoMC in Pennsylvania, seeking a

commitment letter and pricing.  (Doc. No. 28 at 4-5.)

While this conduct did, in part, give rise to Plaintiff's claims against Defendants, the

majority of the alleged unlawful conduct occurred in Puerto Rico.  Many of the key events giving

rise to Plaintiff's claims are distinct from the Pennsylvania contacts relied upon by Plaintiff.

Plaintiff's claims are based on: (1) Defendants' alleged use of the "InfoMC" and "eCura" marks

in the MMM-PMC Proposal and/or presentation without it's knowledge or consent, and (2)

Defendants' alleged unauthorized use of Plaintiff's intellectual property in the MMM-PMC

Proposal and/or presentation.  The trademarks and intellectual property, while arguably

originating in Pennsylvania, were allegedly used by Defendants in the MMM-PMC Proposal and

presentation in Puerto Rico.  This "use" gives rise to Plaintiff's claims.  See Paul Green Sch. of

Rock Music Franchinsing, LLC, 2009 WL 129740, at *4 (although "trade secrets" originated in

and were allegedly misappropriated from Pennsylvania, all other relevant acts occurred in California where that information was used).

Because the majority of the relevant acts giving rise to Plaintiff's claims occurred outside of this district, the Court affords less deference to Plaintiff's choice of forum. However, Plaintiff InfoMC is a Pennsylvania resident that filed suit in its home forum. Thus, this factor weighs slightly against transfer to the District Court of Puerto Rico.

ii.     *Defendants' Forum Preference*

Defendants prefer to litigate this case in Puerto Rico, as CCPR is a Puerto Rican corporation that provides services only in that state, and CBC has on-going relationships with several Puerto Rican entities. (Doc. No. 10-1 ¶¶ 8, 10; Doc. No. 27 at 22 n.14.) However, transfer should not be granted where it "would merely shift the inconvenience from the defendant to the plaintiff." Blue Ribbon Commodity Traders, Inc. v. Quality Foods Distribs., No. 07-4037, 2008 WL 269487, at *3 (E.D. Pa. Jan. 31, 2008) (citing York Paper Co. v. Hollinger Int'l, Inc., No. 03-687, 2003 WL 21295001, at *3 (E.D. Pa. Apr. 22, 2003)). Accordingly, this factor is a neutral one in the transfer decision.

iii.    *Where the Claim(s) Arose*

When the vast majority of acts giving rise to a plaintiff's claims occur in another forum, this factor weighs heavily in favor of transfer. See Gore v. Stryker Corp., No. 09-2987, 2010 WL 3069653, at *4 (E.D. Pa. Aug. 4, 2010). As previously discussed, Plaintiff's claims are based on Defendants' alleged use of its marks and intellectual property in the MMM-PMC Proposal and/or presentation. While these marks and intellectual property arguably originated in Pennsylvania, see Paul Green Sch. of Rock Music Franchising, LLC, 2009 WL 129740, at *2, and Defendants'

-28-

arguably obtained the intellectual property through its contacts with Plaintiff in Pennsylvania, the

majority of the alleged unlawful conduct giving rise to Plaintiff's claims occurred outside of this

forum.  See Paul Green Sch. of Rock Music Franchising, LLC, 2009 WL 129740, at * 4

(transferring case in which trade secrets had situs in Pennsylvania, however, "all of the remaining

components of the cause of action, including the use of the trade secret, arose wholly in

California.").

      According to the Complaint, Defendants prominently displayed the "InfoMC" and

"eCura" marks throughout the MMM-PMC Proposal and/or presentation, and specifically

referred to "eCura" by name at least seventeen (17) times.  (Doc. No. 1 ¶ 22; Pl. App. Ex. K.)

Moreover, Defendants allegedly used, without Plaintiff's knowledge or consent, the same

intellectual property obtained for purposes of the Reforma Proposal in the subsequent MMM-

PMC proposal.  (Doc. No. 1 ¶¶ 19-21; Pl. App. Ex. K.)  Notably, Plaintiff does not argue that

Defendants obtained the intellectual property unlawfully.  It is Defendants subsequent use of that

property on the MMM-PMC proposal that forms the basis of Plaintiff's claims.  While the

alleged harm occurred within Pennsylvania, the actual use of Plaintiff's marks and intellectual

property occurred in Puerto Rico, where MMM and PMC are located.  (Doc. No. 27 at 23; Def.

App. Ex. 6 at 56.)

      Because the alleged trademark infringement, false advertising, unfair competition,

conversion and unjust enrichment all occurred in Puerto Rico where Defendants ultimately

obtained the MMM-PMC contract, the majority of acts giving rise to Plaintiff's claims took place

outside of this forum.  As a result, this factor weighs heavily in favor of transfer.

        iv.    *Convenience of Parties*

In balancing the *Jumara* factors, a court must consider "the convenience of the parties as indicated by their relative physical and financial condition[.]"  <u>Jumara</u>, 55 F.3d at 879; <u>see also</u> <u>Hollander</u>, 2010 WL 4751669, at *4 (recognizing greater inconvenience for plaintiff, an individual, to litigate away from home forum than the defendant corporation).  Here, this factor weighs slightly against transfer.  While all parties in the instant matter are corporations, Plaintiff is a relatively small company with forty (40) employees.  (Doc. No. 28 at Ex. A ¶ 2.)  Defendants are subsidiaries of Comprehensive Care Corporations, a publicly traded corporation since 1969 that provides services throughout the United States.  (Doc. No. 11 at 4.)  InfoMC is a Pennsylvania corporation with its sole office located in Conshohocken, Pennsylvania (Pl. App. Ex. A ¶ 2), while Defendant CBC is headquartered in Tampa, Florida, and Defendant CCPR is located in Puerto Rico (Doc. No. 28 at 5; Pl. App. Ex. V).[17]

Presumably, Defendants have more resources and a greater ability to travel than does Plaintiff, and thus, this factor weighs against transfer to the District of Puerto Rico.

        v.    *Convenience of Witnesses*

Convenience of witnesses is a "particularly significant factor" in this case, which weighs strongly in favor of transfer.  <u>See</u> <u>Paul Green Sch. of Rock Music Franchising, LLC</u>, 2009 WL 129740, at *4 (citing <u>Lindley v. Caterpillar, Inc.</u>, 93 F. Supp. 2d 615, 617-18 (E.D. Pa. 2000)); <u>Nilssen v. Everbrite, Inc.</u>, No. 00-189, 2001 WL 34368396, at *2 (D. Del. Feb. 16, 2001) (convenience of witnesses is "the most important factor in venue transfer analysis.").  Because

---

[17]  As noted in footnote 6 *supra*, the Complaint lists CCPR's principal place of business as located in Tampa, Florida, while Defendants' documents state that CCPR's principal place of business is in Puerto Rico.  (Doc. No. 1 ¶ 4; Doc. No. 10-1 ¶ 6; Doc. No. 11 at 4.)  This discrepancy does not change the outcome of the transfer analysis.

party witnesses are presumed to be willing to testify in either forum despite inconvenience, a

court should focus on the convenience of third-party witnesses.  Copley v. Wyeth, Inc., No. 09-

722, 2009 WL 2160640, at *5 (E.D. Pa. July 17, 2009) (citing Toll Bros. v. Nationwide Prop. &

Cas. Ins. Co., No. 05-1191, 2005 WL 2600207, at *13 (E.D. Pa. Oct. 13, 2005)).

Convenience of witnesses is a relevant factor "only to the extent that the witnesses may

actually be unavailable for trial in one of the fora."  Jumara, 55 F.3d at 879.  In this context,

"actual unavailability" means "outside the subpoena power of the forum, such that testimony

from the witness would be restricted to deposition or video testimony."  Gore, 2010 WL

3069653, at *5 n.7.

Here, Defendants have identified a number of third-party witnesses that are located in

Puerto Rico and therefore "unavailable" for trial in the Eastern District of Pennsylvania.  These

witnesses include personnel from INSPIRA, who served on the CCPR Board during the relevant

time period, as well as personnel from PMC and MMM, whose testimony is relevant to whether

Plaintiff's software and involvement in the project were factors in the award of the contract to

CCPR.  (Doc. No. 27 at 23.)

Plaintiff has identified only two witnesses located in Pennsylvania, Quadir Farook and

Jennifer Hill-Jones (Doc. No. 28 at 5; Pl. Supp. App. Exs. A, B), while Defendants have

identified multiple witnesses outside of the subpoena power of this district, including personnel

from INSPIRA and MMM and PMC[18] (Doc. No. 27 at 23).  Presumably, as Plaintiff's claims are

---

[18]  Plaintiff points out that a number of Defendants' witnesses are located outside of
Puerto Rico, including Richard Powers, Stacey Yawn and Michelle Brochu, and would be
"unavailable" for trial if the Court transfers the case to the District of Puerto Rico.  (Doc. No. 28
at 5-6.)  In response, the Court notes that witnesses who are employed by a party have "little
impact on the balance of convenience analysis since each party is obligated to procure the
attendance of its own employees for trial."  Bond v. Laser Spine Inst., LLC, No. 10-1086, 2010

primarily based on the award of the MMM-PMC contract, InfoMC also would be calling

witnesses that are located in Puerto Rico, including MMM and PMC personnel.  Moreover, the

location of Hill-Jones and Farook have little impact on this factor because they are InfoMC

employees and Plaintiff is obligated to procure their attendance for trial.  See Inaganti, 2010 WL

2471671, at *4 (party witnesses or witnesses employed by defendants have little impact on the

court's decision whether to transfer); see also Nilssen, 2001 WL 34368396, at *2.

Plaintiff also argues that Defendants have failed to demonstrate that third-party witnesses

would "actually be unavailable for trial" in this district, and in the alternative, that depositions of

any "unavailable" witnesses can be videotaped and used in lieu of live testimony.  (Doc. No. 28

at 6.)  The Court finds this argument unpersuasive.

First, Defendants are not required to show that the third-party witnesses are "actually not

willing to appear in Pennsylvania" as Plaintiff alleges.  Rather, Defendants must demonstrate

only that the witnesses are beyond the subpoena power of this Court.  See Gore, 2010 WL

3069653, at *5-6; Nilssen, 2001 WL 34368396, at *2.  In this case, Defendants contend that

certain INSPIRA, PMC and MMM personnel are "key witnesses" located in Puerto Rico, which

is well-outside of the 100-mile compulsory subpoena range.  See Fed. R. Civ. P. 45(b)(2)(B);[13]

see also Hollander, 2010 WL 4751669, at *4 (six non-party witnesses beyond subpoena power of

the court weigh in favor of transfer); Gore, 2010 WL 3069653, at *7 (transferring to Indiana

---

WL 3212480 at *13 (E.D. Pa. Aug. 11, 2010) (citing Inaganti v. Columbia Props. Harrisburg, LLC, No. 10-1651, 2010 WL 2471671 at *4 (E.D. Pa. June 15, 2010)).  Accordingly, in weighing this factor, the Court places greater weight only on those third-party witnesses not employed by the parties.

[13]  In general, under Rule 45(b)(2)(B) of the Federal Rules of Civil Procedure, a subpoena may be served at any place outside that district but within 100 miles of the place specified for the deposition, hearing, trial, production or inspection.

when key witnesses were located more than 600 miles away from Philadelphia); Lehr, 2010 WL 3069633, at *5 (same); Consol. Risk Servs., Inc. v. Auto. Dealers WC Self Ins. Trust, No. 05-6827, 2006 WL 1737471, at *4 (E.D. Pa. June 21, 2006) (convenience of witnesses weighs heavily in favor of transfer when the six witnesses identified by the defendants are beyond subpoena power of the court).

As to Plaintiff's alternative argument that the videotaped depositions of the witnesses can be used in lieu of live testimony, it is well recognized that live testimony is preferred over videotaped depositions or other means of presenting evidence. See Gore, 2010 WL 3069653, at *5 (live testimony is preferred over video conferences); Copley, 2009 WL 2160640, at *5-6 (transfer to Tennessee would help ensure live testimony of unavailable witnesses); Ramsey v. Fox News Network, LLC, 323 F. Supp. 2d 1352, 1356 (N.D. Ga. 2004) ("Given the fact that, when possible, live testimony is preferred over other means of presenting evidence, the convenience of the non-party witnesses weighs most heavily on the Court in deciding on a motion to transfer venue.").  "[V]ideotaped depositions are not an adequate substitute for live trial testimony, when conducting a venue transfer analysis, because '[v]ideo depositions . . . are unlikely to hold the rapt attention of a jury.'"  Nilssen, 2001 WL 34368396, at *3 (citing AlliedSignal, Inc. v. Cooper Auto., Inc., 1997 U.S. Dist. LEXIS 22903, at *11 n.4 (D. Del. July 30, 1997)).

Defendants have met their burden to demonstrate the inconvenience to third-party witnesses if this case is litigated in the Eastern District of Pennsylvania.  As previously discussed, a party need only establish that the relevant witnesses are outside the subpoena power of this Court.  Defendants have identified a number of key witnesses that are located in Puerto

Rico.  Accordingly, this factor weighs heavily in favor of transferring the instant matter to the

District of Puerto Rico.

            vi.    *Location of Books and Records*

    "The technological advances of recent years have significantly reduced the weight of [the

location of the books and records] in the balance of convenience analysis."  Lomanno v. Black,

285 F. Supp. 2d 637, 647 (E.D. Pa. 2003.)  Defendants argue that it is "likely" that third-party

witnesses and CCPR will have relevant documents that are located in Puerto Rico.  (Doc. No. 27

at 23.)  Plaintiff points out that Defendants make only a "generic claim" that relevant documents

will be located in Puerto Rico, but also argue that any documents in the possession of third-party

witnesses can be subpoenaed during discovery.  (Doc. No. 28 at 6-7.)  Moreover, Plaintiff notes

that Defendants produced documents on a compact disc during jurisdictional discovery.  (Id.)

Because document production is possible in either fora through electronic discovery techniques,

this factor is neutral in the Court's transfer analysis.

        C.    Public Interests

    "Consideration of public factors under *Jumara* requires the court to evaluate each forum

and determine where the litigation can proceed in the most efficient and inexpensive fashion."

Hollander, 2010 WL 4751669, at * 5 (citing In re Amkor Tech., No. 06-298, 2006 WL 3857488,

at *6 (E.D. Pa. Dec. 28, 2006)).  Other than the competing local interest in deciding local

controversies at home, the public factors in this case are neutral.  A judgment in either this Court

or the District of Puerto Rico is equally enforceable and Defendants have not suggested that this

Court is more congested than the District of Puerto Rico.  Presumably, both courts are equally

familiar with federal trademark law and are equally capable in presiding over Plaintiff's state law claims.

The "local interest" factor is the only significant public factor in the transfer analysis, which weighs slightly in favor of transfer to the District of Puerto Rico.  Plaintiff is a Pennsylvania corporation with its only place of business in Pennsylvania.  Consequently, there is a strong local interest in this case remaining in this district.  Superior Precast, Inc. v. Safeco Ins. Co. of Am., 71 F. Supp. 2d 438, 448 (E.D. Pa. 1999) ("[T]his district has a strong interest in protecting its residents and providing a forum for resolution of that dispute.").  However, as discussed above, most of the conduct giving rise to Plaintiff's claims occurred in Puerto Rico, and the services that Plaintiff planned to provide were for the benefit of Puerto Rican companies.  Moreover, if Plaintiff had in fact been awarded the PMC-MMM contract with Defendants, it is the residents of Puerto Rico that would benefit from those contracts.  Accordingly, this factor weighs slightly in favor of transfer because the dispute involves Puerto Rican companies and residents to whom Plaintiff was prepared and willing to provide services.  See Paul Green Sch. of Rock Music Franchising, LLC, 2009 WL 129740, at *5 (local community in California has greater interest in resolving dispute because "the actions in question occurred in California, involve parties physically situated in California . . ., and would have an impact most directly upon two businesses that operate in California").

D.      Balancing the *Jumara* Factors

Upon consideration of the public and private interests encompassed within the *Jumara* factors and the parties' submissions in this case, the Court concludes that significant factors weigh in favor of transfer of venue.  Although Plaintiff's choice of forum and the convenience of

the parties weigh slightly against transfer, the balance of the factors compel a transfer.  Most importantly, nearly all of the operative facts giving rise to this action occurred in the District of Puerto Rico.  Moreover, the convenience of non-party witnesses is a strong factor that weighs heavily in favor of transfer because key witnesses are located outside of the 100-mile subpoena radius of the Eastern District of Pennsylvania.  In addition, because the majority of the acts giving rise to Plaintiff's claims occurred in Puerto Rico, and the services that Plaintiff planned to provide were for the benefit of Puerto Rican companies and residents, that forum has a greater interest in deciding this case.  Therefore, the Court finds the District of Puerto Rico is more convenient than the Eastern District of Pennsylvania for trial of this case.

## VII.   CONCLUSION

For the reasons set forth above, the Court concludes that Defendant CBC and Defendant CCPR are subject to personal jurisdiction in this district.  As such, the Court will deny Defendants' Motion to Dismiss Plaintiff's Complaint.  However, the Court concludes that considering the factors discussed above, this case should be transferred to the District Court of Puerto Rico.  Consequently, the Court will grant Defendants' Alternative Motion to Transfer Venue.  An appropriate Order follows.